A sheriff's sale of lands is within the statute of frauds and requires a deed or note in writing specifying with certainty the lands sold, to pass the estate. Where the sheriff executed a deed for land purchased at auction and delivered it to the attorney of the plaintiff, to be delivered by him to the grantee on the purchase-money, it was held to be an escrow; and that until the condition was performed, the estate continued in the debtor whose lands had been thus sold by the sheriff. By the act of attainder of the 22d October,

opinion, they are bound to do, to entitle them to recover under the statute, a nonsuit must be entered according to the agreement, for that purpose, in the case.

Judgment of nonsuit.

Jackson, ex dem. Gratz and others, against Catlin.

THIS was an action of ejectment for lands, in the county of *Otsego*. The cause was tried before Mr. Justice *Spencer*, at the *Otsego* circuit, the 3d June, 1806.

At the trial, the plaintiff gave in evidence, letters patent, dated the 16th January, 1770, under the great seal of the province of *New-York*, for 40,000 acres of land, situated in the county of *Tryon* (now in *Otsego*) to *Alexander M'Kee*, and 39 other persons; and also a release from *M'Kee*, and the other patentees, of the whole tract to *George Croghan*. It was admitted, that the lessors of the plaintiff, are the grand-children, and heirs at law of *Croghan*; and it was proved, that the premises in question are within the patent, and in possession of the defendant.

To show a subsisting title, out of the lessors of the plaintiff, the defendant produced in evidence, a judgment upon a *scire facias* in the supreme court of *New-York*, in favour of *William Peters*, against *George Croghan*, for 5,739l. 12s. 2½d. debt and 9l. 1s. 10d. costs, docketed the 15th December, 1773; and an exemplification of a *vendi-tioni exponas* to the sheriff of the county of *Tryon*, tested the 30th April, 1774, and returnable at the term of July following, upon which there was an indorsment of the principal, interest and costs to be levied, and a return in-

1779, estates upon condition, did not become forfeited, or vest in the people of this state. Where a person had purchased land at a sheriff's sale, but had not paid the money, and afterwards became attainted, under the act, it was held, that the state could not, by paying the money, perform the condition so as to make the deed, which had been delivered in an escrow, absolute, and thereby to vest the estate in the person attainted. A person attainted under the act is considered as civiliter mortuus. If, by a private act of the legislature, the property of a person is directed to be sold by the surveyor-general, without any warranty, and the money to be paid to certain creditors, it does not take away the rights of third persons, but amounts only to a quit-claim of any right or interest of the state.

dorsed by the sheriff, that he had levied the debt and damages of the lands and tenements, &c. and had the money ready, &c. The defendant further offered in evidence the exemplification of a deed, dated the 9th November, 1774, from the sheriff of *Tryon* to *Thomas Jones*, in fee, of the premises in question, which deed recited, 1. A *testatum fieri facias*, upon the judgment against *Croghan*, tested the 22d of January, 1774, returnable the third *Tuesday* of [*]April following, with a return of the seizure of the lands of *Croghan*, and that they remained unsold, &c. 2. The *venditioni exponas* mentioned above. 3. A *testatum fieri facias* out of the supreme court of *New-York*, tested the 19th April, 1774, in favour of *John Morton* against *Croghan*. 4. A mortgage subsequent to the principal judgment in favour of *Peters*, and prior to that of *Morton*, dated 14th February, 1770, from *Croghan* to *Goldsbrow Banyer*, on the said tract of land. 5. A sale at auction on the 12th and 13th of July, 1774, of the premises in question, to satisfy the said debts, &c. and that *Jones* was the highest bidder and purchaser. Upon the deed to *Jones* was indorsed a receipt in full for the consideration money, as paid at the date of the deed, &c. The defendant also produced the exemplification of a deed of release, dated the 30th of November, 1774, from *Banyer* to *Jones*, in fee, indorsed on the deed poll from the sheriff, reciting the mortgage and the assent of *Banyer* to the sale, and releasing his right to the premises. The deed and release were, on the 5th October, 1789, proved by a subscribing witness to have been executed and delivered to *James Duane*, as *escrows*, to be delivered to *Jones*, the purchaser, whenever the consideration money, mentioned in the sheriff's deed, should be paid by him to *Duane*; and upon this proof the deeds were recorded in the clerk's office in *Montgomery* county, on the 11th November, 1794.

The counsel for the plaintiff objected to the evidence,

[* 249]

1. Because the sale by the sheriff, and the deed given by him were void, having been made on credit. 2. Because the condition on which the deeds were delivered was not proved to have been performed; but the judge overruled the objections, and the deeds were read in evidence.

The plaintiff then read in evidence, an act of the legislature of this state, passed the 22d March, 1788,* which recited that *William Peters* had, by his petition, represented to the legislature, that previous to the late war, he obtained a judgment against *George Croghan*, on which a *venditioni exponas* issued to the sheriff of *Tryon*, who [*]thereby seized certain lands, &c. and sold the same to *Thomas Jones*, and three others, in different parcels, and that the sheriff on the 9th November, 1774, had executed deeds to the purchasers respectively, and delivered the same to *James Duane*, the attorney for the plaintiff, as *escrows*, to take effect on the payment of the purchase-moneys; that the purchasers not having paid any part of the .purchase-moneys, the conveyances still remained with the said *James Duane;* and that the plaintiff in the suit, by reason of the war, and the attainder of the said four purchasers, had been prevented from taking measures to compel them to pay the purchase-money. The act then *enacted,* that it should be lawful for the surveyor-general to sell the lands so purchased by *Thomas Jones* and others, in the manner directed by the act for the sales of confiscated estates;* and to pay the amount of the purchase-moneys on the sales in 1774, with interest from 9th November, 1774, to the judgment creditors of *Croghan*, according to the priority of their judgments; the overplus, if any, to be paid into the treasury, provided that before the payments be made, *W. Peters* should deliver to the commissioners the sheriff's deeds in 1774 and the *venditioni exponas*, and that the deeds on such sales by the state should not operate as a warranty.

* *Greenleaf's* edition of the Laws of *N. Y.* vol. 2. p. 222. But the section giving relief to Peters is omitted in this edition.

[* 250]

* *Greenleaf's* Ed. of Laws of *N. Y.* vol 2. p. 200.

The act further directed the surveyor-general, to file the *venditioni exponas* in the clerk's office of the supreme court, and to record the said sheriff's deeds in the clerk's office of *Montgomery*.

The plaintiff further gave in evidence, a deed from the surveyor-general, dated 8th September, 1795, reciting a sale at public vendue on 7th January, 1789, to *James Duane*, for 2,445*l.* and conveying the premises, &c. to *James Duane;* and also a deed poll indorsed thereon, dated 9th November, 1795, from *J. Duane*, to certain trustees appointed by *William Peters*, of which *Richard Peters* was one. The plaintiff then produced a witness who proved, that the defendant had acknowledged himself to be tenant to the said trustees, and had paid rent to him as their attorney The parol evidence was objected to, [*]but the judge was of opinion, that the declarations and acts of the tenant were good evidence of the tenancy under the trustees.

[* 251]

It was admitted, that *Thomas Jones* was attainted by the act of attainder of the 22d of October, 1779.

A verdict was taken for the plaintiff, subject to a case containing the above facts, with liberty to either party to turn the same into a special verdict; and it was agreed that the court might award a new trial, or grant a nonsuit, or order judgment for the defendant, according as they should be of opinion. The case was argued at the last term.

*Henry*, for the plaintiff. I shall contend, 1st. That nothing passed by the sheriff's sale to *Jones*. 2d. That the act of 1788 was void, and could give no title.

1. The statute of 5 *Geo.* II. *ch.* 2. first rendered real estates liable to be sold under a *fieri facias*, and they were directed to be sold in the same manner as personal property. This was the law of the colony. A sheriff has no authority to sell on *credit*. He can sell only for ready money. It is a wise and politic provision of the law, for the better security of creditors, whose debts would be in

danger of being lost, if the sheriff were allowed a discretion in transferring the property seized by him, without receiving the purchase money. It is true, that in the present case, the sheriff was so cautious as to deliver the deed as an *escrow;* but he had no authority even to make such a delivery. It was, in fact, a sale on *credit,* and, therefore, void. Admitting, however, that the sheriff had authority to deliver the deed as an *escrow,* still, as the condition was never performed, the deed was inoperative and void. The deed was to be delivered on payment of the money, and no time was fixed for the payment. Where no time or place is appointed for the performance of an act or condition, it must be done [*] immediately or within a resonable time,* and what is a reasonable time, is a question of law.† The general rule, that where no time is fixed for the payment of money, it ought to be done presently, applies with peculiar force to sheriff's sales : it follows, therefore, that from 1774 to 1779, the deed was inoperative, for the condition had not been performed. The act of 1788, in its preamble, expressly states, that the condition had never been fulfilled.

By the act of attainder, in 1779, *Jones* became *civilly dead,* and was incapacitated from performing the condition. The attainder of *Jones,* however, could not vest any right in the people of this state to avail themselves of the condition, nor did they acquire any right to the land. The act for which *Jones* was attainted was not *treason;* but even in case of *treason* in *England,* the king could not avail himself of a condition.‡ The sale, therefore, was inoperative, first, from the lapse of time ; and secondly, from the legal incapacity of the party to perform the condition.

2. There is nothing in the act of 1788 which shows that any right to the land was vested in the people, by the attainder of *Jones.* The recitals, on the contrary, which set forth the motives of the legislature in granting

[* 252]
* 1 *Bact. Ab.*
665. *Cond.* p.
3. 2 *And.* 73.
*Co. Litt.* 208,
b 6 *Co.* 30, *b.*
*Roll. Ab.*436.
† 6 *Comyn's*
*Dig.* 334.
*Temps.* (D.)

‡3 *Co.* 2. *h.* 4.
*b. Winchester's case,* 7
*Co.* 21. *Anglefield's case,*
*Latch,* 107.

the act, exclude every pretence of a right to the land. The sale is directed to be made in the same manner as under the commissioners of forfeiture; yet the act expressly declares, that the legislature are not to *warrant* the land sold in this case. The act authorizes the sale of the land, but not of any interest of the state. The deed from the surveyor-general conveying the title and interest of the people, went beyond his powers under that act. But the act itself was unconstitutional. It directs the land to be sold in an extrajudicial manner, so as to devest the heirs of *Croghan*, without being heard. The legal remedy was by a *scire facias*, in which the heirs of *Croghan* [*] might have been brought before the proper court, and have pleaded, and had the benefit of a trial by jury.

[* 253]

SPENCER, J. If the state had no right in the land, none could pass by the act of the legislature.

*Platt*, for the defendant. We shall contend that the legislature had power to convey the land.

KENT, Ch. J. If the state had no right, they could grant none. We do not wish to hear the plaintiff's counsel on that point.

*Platt* and *Gold*, contra. (*Hoffman* and *Pendleton* also on the same side.) 1st. No authority has been cited to show that a sheriff cannot sell upon a credit; but were it otherwise, it would not render the sale void. The only effect would be, to make the sheriff responsible to the party injured, in case of loss. But the sale, in the present instance, was not upon credit. There was no stipulation before, or at the sale, that any credit should be given to the purchaser. Some delay of payment was necessary, in order to prepare the conveyances, but such a delay is no evidence of a credit given. The reason assigned by the other side for this objection is, the delay of payment to the creditor. The objection, then, ought to come from the creditor, not from the debtor. The policy

of the rule contended for, applies only where the responsibility of the sheriff comes in question, not where the creditor himself steps in, and assumes the risk of payment on himself. Here, by an agreement made between the plaintiff's attorney and *Jones*, after the sale, time was given for the payment. No possible evil can result in such a case. Suppose the creditor should appear at the sale, and request the sheriff to accept a particular person as a bidder; this would exonerate the sheriff, and no danger of fraud could exist.

Again; it is said that this deed was delivered as an *escrow*. There is no evidence of its being delivered as an *escrow*, except what was said by the subscribing witness, who might have called it a *mortgage*, with equal [*] propriety. To make a deed an *escrow*, it must be delivered to a *stranger* to be kept, until certain condition be performed, to be then delivered to the grantee.* The delivery in such case should be explicit and formal. If a deed be delivered to the grantee, or party in interest, it is absolute. Here the deed was delivered, not to a stranger or naked trustee, but to the attorney of the plaintiff himself. The sheriff returned the execution satisfied. The title of *Croghan* was devested by the sale, and satisfaction of the judgment, whether the purchase-money was paid or not. Had the sale been conditional, the sheriff would not have returned the *venditioni exponas* satisfied. If the deed had been delivered to *Jones*, and he had refused to pay the money, the sale would not have been void. If a bill in equity had been filed against *Jones*, it would not have been necessary to make *Croghan* a party. If *Jones* had persisted in not paying the purchase-money, the chancellor would have ordered a sale of the land to indemnify *Peters*, rendering the surplus, if any on such sale, to *Jones*, or making him responsible for the deficiency.

Again; there is an obvious difference between a trans-

* Shepherd's
Touchstone,
56. 57. Co.
Litt. 36. a. 3
Viner, tit.
fait, (J. K.)

fer by a common person, and a sale by a sheriff. In the
first case, many circumstances may arise to alter, or put
an end to the contract of sale; the law, therefore, re- Jackson
quires the delivery of a deed as the consummation of the v.
Catlin.
contract. A sheriff's sale does not require the formal
and technical sealing and delivery of a deed. If sales
by sheriffs are within the statute of frauds, and memo-
randum in writing, whether indorsed on the execution,
or connected by a schedule, would be a sufficient com-
pliance with the act.† If the distinction now contended †2 *Caines*, 61.
*Simonds* v.
for be well founded, a sale by a sheriff cannot be affected *Catlin*.
by the doctrine of *escrow*. *Jones* directed the deed to be
lodged with *Duane*. The delivery of it to *Duane* com-
pleted the sale as it regarded the sheriff. He was
then *functus officio;* no further act should be done on his
part.

[*] Supposing the deed to have been delivered as an [* 255]
*escrow*, we contend that the condition, in judgment of
law, has been performed, and the deed to *Jones* thereby
become absolute. If a grantee die, or be attainted be-
fore a performance of the condition, and it afterwards be
performed, the delivery of the deed has relation back to
the original purchase, and enures to the persons rightful-
ly claiming under the grantee. By the attainder of *Jones*,
all his interest in the land became vested in the state, as
fully as if it had been assigned by deed. They acquired
the right of redeeming the pledge, or performing the con-
dition by paying the money, or compromising with the
creditor. The act to be performed was not personal, and
might as well be done by the state as by *Jones* himself.
The result was a compromise with *Peters*, and a sale of
the lands, by which he was paid nearly the whole amount
of his principal and interest. All has been done that a
court of chancery would have directed in such a case.

Again; where no time is fixed for the performance of
a thing, it may be done at any time, unless the party to

NEW YORK, be benefited take some measure to hasten the perform-
May, 1707. ance. *Peters* was the only person to be benefited by the
Jackson condition; he alone could compel its performance, or
v. take advantage of the failure of the other party. But
Catlin, the events of the revolution, and the situation of the par-
ties furnish sufficient reasons for the delay. The act was
not unconstitutional. The legislature had a right to or-
der the sale of land to pay a debt judicially ascertained
by a regular judgment. It deprived the debtor of no com-
mon law right. The only ground for impeaching the
validity of the act of the legislature, would be some fraud
practised by *Peters* in obtaining it; but this is not pre-
tended. The whole case is fully and fairly disclosed in
the recital. The act may be said to have a double as-
pect. If the sale under the sheriff was complete, and
transferred the title from *Croghan* to *Jones*, then it was
intended that the estate of *Jones* should be sold to pay
[* 256]  *Peters*. If the [*] title of *Croghan* was not devested by
the sheriff's sale, then it was intended to sell the estate
of *Croghan* or his heirs, to satisfy a *bona fide* judgment
creditor. The state very properly refused a warranty.
The act was passed on the petition of *Peters*. The le-
gislature could not know the precise state of the title of
*Croghan* or *ones*, and it was prudent to avoid responsi-
bility. Th.. payment of the surplus into the treasury fur-
nishes no gi und of objection. The legislature directed
precisely wha' a court of equity would have ordered in
case of an equitable mortgage. The act was just and
equitable, and the court will adopt every favourable in-
tendment in support of it, and of the title of the defendant.

*Harison*, in reply. The power of a sheriff, in regard
to sales, is so liable to abuse, that it was very wisely de-
*2 Caines*, 61. cided by this court, in *Simonds* v. *Catlin*,* that they were
within the statute of frauds, and that no estate would
pass from him without some note or memorandum in
writing. In the present case there was no writing or act

of *Jones*, by which he could be compelled, in a court of equity to complete the purchase.   If there was any sale, it was upon credit for a limited or unlimited time.   It was not a sale for ready money, for none was paid.   A power in a sheriff to sell on credit, is inconsistent with the policy of the law.   It would open the door to speculation and fraud, to the great injury of creditors.   There is nothing in the return of the *venditioni exponas*, which can help the sale.   The writ appears not to have been filed prior to the act of the legislature.   True, it is now filed, but there is no date of the time indorsed.   There is nothing, therefore, to prevent the court from saying that this sale by the sheriff was void.  If no estate passed from the sheriff, then the fee remained vested in *Croghan*, descendible to his heirs; but liable to be devested, in case *Jones* should complete the purchase.   It is said, that the deed from the sheriff was not delivered as an *escrow*.   The parties were not ignorant persons, and must have well understood the meaning of the word.  [\*]In every legal sense, it was an *escrow*.   The deed was signed, sealed, and delivered, not to the party, but to a third person, or trustee.   The parties were *Croghan*, by his agent, the sheriff, and *Jones*, the grantee.   *Duane* was no party, for he had no interest, neither *in re* nor *ad rem*.   The mere circumstance of *Duane's* being the attorney of *Peters*, does not make him a party, in the legal sense of the word ; it gave him no interest whatever in the land.   If the sale then was on credit and void, or if the deed was delivered as an *escrow*, the estate never passed out of *Croghan*, for a fee cannot be in *abeyance*.   In this case it must have remained in *Croghan* or his heirs, until the condition was performed.   Has the condition been performed? From 1774, to 1776, *Jones* did no act whatever to consummate the sale.   He was attainted in 1779, at which time he had no interest in the land.   He had no estate, either in possession, reversion, or remainder, or by way of executory

*NEW-YORK,*
*May, 1807.*

Jackson
v.
Catlin.

[\* 257]

devise; and there are no words in the act by which estates, on condition, or mere possibilities, would vest in the state. As this was not an attainder for treason, and our act, is different from the act of 33d *Henry* VIII. it must rest on the common law doctrine. Before that act, hereditaments or conditions were not vested in the king. In the *Duke of Norfolk's* case, the distinction is laid down as to the personal conditions, and conditions to be performed by another. It was decided, that personal conditions were not forfeited to the king on attainder for treason.

Again; a condition like the one in the present case, must be performed in the life-time of the party, and not at any indefinite period. The right to perform cannot descend from generation to generation, *ad infinitum.* By the attainder and banishment of *Jones,* he became *civilitur mortuus,* and the legal consequences may be considered the same, as in case of his natural death.* If so, then there was an end of his power to perform the condition. [*] But it may be asked, is *Peters* to be without remedy? The filing of the writ of *venditioni exponas* was a voluntary act in him or his agent, and he must abide by the consequences. If the writ had not been returned and filed, he might have brought a *scire facias* to revive the judgment, and called in the party to show if it had been paid or satisfied. This is the ordinary and common law mode of proceeding. Or if it had appeared that there was a mistake in filing the writ, a court of equity might perhaps lend its aid to correct the mistake, and to compel the payment of the debt. But *Peters* has thought proper to apply to the legislature for its extraordinary interposition and relief. The right of the state to dispose of the property of an individual for public purposes, subject to a compensation to the party, is not questioned. But it would be against all law and right, for the legislature to take the property of one person to pay another; and by this extraordinary mode of proceeding, deprive

* Co Litt.
133. a. Jenk.
Cent 1. case
4 Black. Com-
132.
[* 258]

the party whose property is taken away, of the benefits of the common law process and trial by jury, in the ordinary course of justice. In this view the act must be considered unconstitutional; for if they had power, by the recital of a debt in an act, to direct the property of the debtor to be sold or conveyed to satisfy the creditor, there would be an end to the right of trial by jury. But, in truth, the legislature neither intended to do, nor have they done any such thing. They acted under some mistake about the right of the state in the land, acquired by the attainder of *Jones*, and they intended merely to transfer such right, if any such existed in the state. They never could intend to convey the estate, or rights of *Croghan*. If the state had no right to the land, nothing passed under he act ; the property still remains in the heirs of *Croghan*, subject to the equitable claim, on account of the debt due *Peters*.

KENT, Ch. J. delivered the opinion of the court. The title of the lessors of the plaintiffs, as heirs to *Croghan*, having in the first instance been made out, the merits of the defence depend on the legal operation and effect of the [*] sheriff's sale, in 1774, and of the sale by the surveyor general, under the act of the 22d of March, 1788.

I shall first consider the effect of the sale by the sheriff. This sale was made at auction, in July 1774, and a deed was executed on the 9th of November following, in favour of *Jones*, the purchaser, and delivered to *James Duane*, as an *escrow;* and to be delivered to *Jones* on payment of the purchase-money. This fact appears, not only from the testimony of a subscribing witness to the deed, but from the petition of *William Peters*, as recited in the act of March, 1788; and it is conclusive proof, that the sale was not intended to be absolute, until the purchase-money was paid. There is nothing in the case to warrant the idea that the sale was upon credit. It was, no doubt, the understanding of the parties, that the deed was to be

NEW-YORK,
May, 1807.

Jackson
v.
Catlin.

[* 259]

executed and the money paid, within a reasonable time, or with all convenient speed; and that until the money was paid and the deed delivered, the sale was not to operate, and the title was to continue in *Croghan*. This is not only the obvious meaning of the transaction, but it is the conclusion of law. According to the decision in *Simonds* v. *Catlin*, (2 *Caines*, 61.) a sheriff's sale of lands is within the statute of frauds, and requires a deed or note in writing, to pass the estate. The deed in question was clearly an *escrow*. It was left with *Duane* to be delivered over to *Jones*, on payment of the purchase-money. This was a plain and specific condition, to be performed before the deed could operate. A deed is delivered as an *escrow*, when the delivery is conditional, that is when it is delivered to a third person, to keep until something be done by the grantee; and it is of no force until the condition be fulfilled. The condition may consist in the payment of money as well as in the performance of any other act. (*S. Touch.* 55. 7 *Viner*, *tit. faits. O. pl.* 4.) There is no weight in the observation made by the counsel, that the deed was not delivered to a stranger. *Duane* was attorney to *Peters*, the plaintiff in the execution, but he was still a stranger to *Jones*, the purchaser. There was no privity existing between them. If the deed did not pass the estate for want of delivery, the return [*] upon the execution clearly did not. The case of *Simonds and Catlin* settled this point. The note, or memorandum in writing, must specify with sufficient certainty, the lands sold, and who was the purchaser, for it does not otherwise answer the intent of the statute. The return, in the case before us, has no manner of certainty. It states only, that the sheriff had sold of the lands of the defendant to the amount of the demand. My opinion then is, that neither the sale, nor the deed, nor the return on the execution, passed the estate. We are next to see whether the condition has at any time since been perform-

[* 260]

ed, so as to confirm the sale and give effect to the deed. The petition of *William Peters*, to the legislature, in 1788, admitted that the purchase-money had not then been paid, and that the deed was still remaining in the hands of *Duane*. The title to the premises, of course, continued in *Croghan*, for the *fee* cannot be in *abeyance*, but must abide in some person. Not having passed to *Jones*, by the sale, for the want of payment, it rested in *Croghan*. This leads me to consider, in the second place, the effect of the act of attainder and of the sale by the surveyor-general.

The act of the 22d October, 1779, attainted, among others, *Thomas Jones*, of the offence of adhering to the enemies of this state. This was a specific offence, and was not declared or understood, to amount to treason, because many of the persons attainted had never owed any allegiance to this state. The forfeitures arising from this attainder, must be sought for in the act, and no where else. By this act, *Jones* forfeited " all his estate, both real and personal, held or claimed by him, whether in possession, reversion, or remainder, and also all estates and interests claimed by executory devise or contingent remainder." It is then to be examined, whether the state, by this act of attainder, acquired any right to perform the condition.

The expression, *real estate*, signifies such an interest as the tenant hath in land. *It is the condition or circumstance in which the owner stands, with regard to his property.* (1 *Inst.* 345, *a.* 2. *Black. Com.* 103.) It implies, [*] Here the statute defines the estate. It must be an therefore, a *right, interest, or ownership* existing in the soil, interest in the land existing in possession, reversion, remainder, by executory devise, or contingent remainder. The condition in question was neither of these. No interest, whatever, in the premises had vested. *Jones* had nothing, not even a *scintilla juris*, in the land, which he

[ *161]

NEW-YORK,
May, 1897.

Jackson
v.
Catlin.

could assign so as to enable the assignee to perform the condition. A mere posibility is not the subject of a grant, unless it be a possibility coupled with an interest. (*Chep. Touch.* 414. *pl.* 18. 38 *Viner. tit. Possibility.* B. *tit. Grant. N.*) In *Marks* v. *Marks,* (10 *Mod.* 419. 1 *Str.* 129.) it was admitted to be a maxim of law, that a stranger could not take advantage of a condition, for it was not assignable. An assignee must be privy in estate, and have an interest in the condition, or he cannot perform it. (*Litt. sec.* 336. *Co. Lit.* 207. *b.*) Such general words as those used in the act of attainder, have never been construed, in any period of the English law, as extending to a condition. At common law, no condition, use, or mere right of action was forfeited to the king upon attainder of treason, notwithstanding such attainder reached the lands and tenements. (3 *Inst.* 19. 1 *Hale* 244. 247. 2 *Hawk.* 637.) This restriction led to the statute of 33 *H.* 8. c. 20. which declared, that uses, entries, and conditions, as well as possessions, reversions, and remainders, should be forfeited upon every such attainder. And since that statute the only question has been, whether the condition was personal, and inseparable from the party attainted, or could be performed by the crown. The statute of 26 *H.* 8. *c.* 13. declaring the forfeiture in treasons, extended it *to all estates of inheritance, in use or possession, in lands, tenements, and hereditaments, by any right, title, or means,* &c. These words are certainly as broad as those used in our act of attainder; yet they were not considered as including a condition, or a mere right of action. It required the express words of the statute of 33 *H.* 8. to embrace those cases.

The decisions which have since been made in *England,* on the question of the forfeiture of conditions, are instructive [*] examples of the strictness with which the courts have construed this right of forfeiture since the statute of *H.* 8. and of the independent spirit displayed in the dis-

[* 262]

cussions on this subject, even under the enormous pressure of the prerogative of the *Tudors* and *Stuarts*. In the *Duke of Norfolk's* case, 11 *Eliz.* a personal condition was held not to be forfeited by attainder for treason ; and in *Englefield's* case, 33 *Eliz.* (7 Co. 11.) it was ruled that a condition, not being personal, might be performed by the *Queen*, and yet it was not thought prudent to rely upon this judgment, and the statute of 35 *Eliz.* confirmed the forfeiture. The case of *Wardner* v. *Hardwin*, (*Latch*, 107. *Wm. Jones*, 137.) on the question whether the condition was forfeited, is said to have walked through all the courts in *Westminster-Hall*, and the court of king's bench was at last equally divided. In *Smith* v. *Wheeler*, (1 *Mod.* 38. 1 *Hale, H. P. C.* 246.) it was decided that the trust was personal, and not forfeited by attainder, notwithstanding the attainted person had the *jus disponendi*, and was according to Sir *Matthew Hale*, " guilty of the execrable murder of the king."

In every view, therefore, of this question, whether we consider the technical force and meaning of the words used, or the rule that such a possibility is not assignable ; whether we consider the principle of the common law, that a condition was not subject to forfeiture for treason, or the series of decisions since the statute of *H. 8.* showing the strictness with which such forfeitures have been regarded, I am clearly of opinion, that the attainder of *Jones* did not vest in the state, any right to pay the purchase-money and take the land. The state was a stranger to the condition, and had no right to perform it.

*Jones* was to be considered as *civiliter mortuus* by the act of attainder ; but whether his legal representatives were competent to perform the condition it is unnecessary to inquire, because there is no evidence before us, that any such performance was ever attempted. The heirs of *Croghan* have, therefore, an existing title to the premises, unlesss the sale by the surveyor-general was an

NEW YORK
May, 1807

Jackson
v.
Catlin.

alienation of their right. The sale was made under the act of the 22d of March, 1788, which, so far as related to this subject, was a private act, and liable to the rules of construction applicable to such statutes.

In *England*, a general saving clause is now always added, at the close of every private act, of the rights and interests of all persons, except those whose consent is obtained ; and before this practice of inserting the saving clause, it was held that a private act did not bind strangers. (2 *Black. Com.* 345. 4 *Cruise's Dig.* 518, 9.) In *Boswell's* case, (25 and 26 *Eliz.* cited in *Barrington's* case, 8 *Co.* 138, *a.*) it was resolved in the court of wards, that when an act of parliament maketh any conveyance good against the king, or other person certain, it should not take away the right of any other, although there be not any saving in the act. This just and liberal decision, and which is also warranted by the opinion of Sir *Matthew Hale*, (1 *Vent.* 176.) is perfectly applicable to the present case, The act directs only the surveyor-general to sell the lands so purchased by *Thomas Jones*, and to execute a deed without a clause of warranty ; but does not declare the operation of this deed as against the rights of *Croghan* and his heirs. In the language of *Barrington's* case, this act does not make the deed good, as against any person certain, except it be the state, and therefore, it shall not take away the right of any private person. It is a mere quit-claim of the right and interest, which the state might have had in the premises, without declaring the extent or certainty of that right. If the act had declared the sale to be a bar to the claim of *Croghan*, a very serious question would have arisen on the validity of a statute taking away private property, without the consent of the owner, and without any public object, or any just compensation. But it is evident that no such operation was contemplated. The act passed, probably, under a misapprehension of the rights of the state, re-

sulting from the attainder of *Jones*. The sale was direct-
ed upon the suggestion of *Peters*, for the purpose of pass-
ing the interest of the state, whatever it might be, *valeat
quantum valere potest*. The title of *Croghan* [*] is not so
much as once mentioned in the act, and was undoubtedly
intended to be left to its due weight and effect, in the or-
dinary course of justice.

<div style="float:right">NEW-YORK,
May, 1807.

Kane
v.
Col.In.Comp.

[* 264]</div>

The court are therefore of opinion, that the plaintiff is
entitled to judgment.

<div style="text-align:center">Judgment for the plaintiff.</div>